UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
FLORANGELIS MARIA CABREARA MEDINA,
ALEXANDER JOSE VIZCAINO MARRUFO,
JANE DOES 1-10,
JOHN DOES 1-5,
KAREEMA WASHINGTON, and
ERICA SEYMOUR,

       Plaintiffs,

vs.

NEW YORK STATE DIVISION OF MILITARY
AND NAVAL AFFAIRS,
RAPID RELIABLE TESTING NY, LLC
d/b/a DOCGO,
DEVEN COLON,
RIGOBERTO NUÑEZ, and
JOHN DOES 1-10,

       Defendants.
------------------------------------------------------------- X

Civil Action No. 24-951

**AMENDED COMPLAINT**

**and**

**JURY DEMAND**

## SUMMARY OF COMPLAINT

In response to the 2023 surge of migrants and asylum seekers, New York City awarded contracts to for-profit companies, primarily DocGo, which established Humanitarian Emergency Relief and Response Centers ("HERRC") across New York State, including one in Cheektowaga, near Buffalo. Plaintiffs either resided as guests at the HERRC or were employed there. Guests living at the HERRC were subjected to victimization by both the New York State Division of Military and Naval Affairs (the "National Guard") and DocGo staff, who were involved in the sexual exploitation of guests. Additionally, instances of violence, including physical assaults by DocGo employees against guests, occurred. Plaintiffs who worked at the HERRC reported these events and other concerns to senior staff, but regrettably, the situation deteriorated further, leading to increased abuse and exploitation by DocGo.

# PARTIES

**Plaintiffs**

1. Florangelis Maria Cabreara Medina ("Flor") is an asylum seeker from Venezuela and spouse of Alexander Jose Vizcaino Marrufo ("Alexander") who traveled to the United States fleeing persecution.

2. Alexander Jose Vizcaino Marrufo is an asylum seeker from Venezuela and spouse of Flor.

3. Jane Does 1-5 are asylum seekers housed at the Cheektowaga HERRC.

4. Kareema Washington ("Washington") is a former employee and supervisor at Platinum Community Care, who resigned in frustration over her treatment and the conditions at the HERRC.

5. Erica Seymour ("Seymour") is a former employee of Platinum Community Care, a subcontractor of DocGo, formally stationed at the Cheektowaga HERRC.

**Defendants**

6. New York State Division of Military and Naval Affairs, or New York Army National Guard ("NY National Guard"), is a military reserve force organized under the dual control of the federal government and the State of New York.

7. Rapid Reliable Testing NY, LLC d/b/a DocGo is a legally recognized for-profit corporation operating under the laws of New York and other jurisdictions.

8. Deven Colon is a Sergeant in the National Guard who was stationed at the Cheektowaga HERRC.

9. Rigoberto Nuñez is an employee of DocGo working at the Cheektowaga HERRC.

10. Defendants John Doe 1-5 are officers in NY National Guard who participated in the events described herein.

11. Defendants John Doe 6-10 are employees of DocGo working at the Cheektowaga HERRC who participated in the events described herein.

## JURISDICTION AND VENUE

12. Jurisdiction over these claims is conferred upon this Court by 31 U.S.C. § 3732 of the FCA and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

13. Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732 because Defendants transact business in the Southern District of New York and many of the acts described herein occurred there.

## FACTUAL ALLEGATIONS

### A. DOCGO LIED TO MIGRANTS SENDING THEM TO A RUN-DOWN HOTEL IN BUFFALO BUT TELLING THEM IT WAS CLOSE TO MANHATTHAN.

14. In response to the surge of migrant and asylum seekers in 2023, New York City paid billions of dollars to private contractors to handle the crisis. Defendant DocGo is reportedly the single largest recipient of these funds.

15. Defendant DocGo, initially a medical Covid testing company, diversified its services following the pandemic to include Mobile Health Care, Medical Transportation, and Remote Patient Monitoring. It only recently entered the migrant care business.

16. Although paid hundreds of millions of dollars according to publicly available information, Defendant DocGo was woefully unprepared, unqualified and unorganized for its duties, and carried out its duties with negligence leading to the damage of the Plaintiffs, as outlined in this complaint.

17. Defendant DocGo opened a "Humanitarian Emergency Relief and Response Center" (HERRC) in Cheektowaga, New York and began shipping migrants there via chartered bus. The facilities were merely old hotels, scattered throughout the vast geographic area of New York State.

18. The individuals seeking asylum (referred to as "Plaintiff guests" herein, under the care and control of Defendant DocGo) were deceived by Defendant DocGo employees into traveling to Buffalo and other areas outside of New York City.

19. They were informed that they were being transported a short distance from New York City, whereas, in truth, they were taken approximately 8 hours away by bus to Buffalo.

20. Plaintiff Seymour commenced her employment at Platinum Community Care ("PCC") on June 30, 2023, as a social worker. PCC was subcontracted to provide services at the HERRC near Buffalo in Cheektowaga.

21. Although Plaintiff Seymour was employed by PCC, DocGo exercised control over her employment and the other PCC employees assigned to the Cheektowaga HERRC.

22. Defendant DocGo assigned work to PCC employees, dictated their hours of work, provided the facilities and resources used by PCC employees for work at the Cheektowaga HERRC, and had control over whether PCC employees were terminated.

23. Plaintiff Seymour reported directly to Plaintiff Washington and collaborated daily with Plaintiffs Jane Doe 6-10 and Plaintiffs John Doe 1-5, all current employees of PCC. All witnessed and reported many of the same issues of negligence and abuse Seymour and Washington witnessed and reported, as outlined in this complaint.

24. The aforementioned PCC employees Plaintiffs Jane Doe 6-10 and John Doe 1-5 live in a state of reasonable and justifiable fear of adverse employment actions, including

4

termination, as well as damage to their professional reputations, due to the mistreatment experienced by Plaintiff Seymour, Plaintiff Washington, and other colleagues—thus, they remain anonymous in this complaint.

25. Plaintiffs Seymour, Washington, John Doe 1-5, and Jane Doe 6-10 all had DocGo emails, and were managed directly by DocGo supervisors. Upon information and belief, DocGo leadership (including members of its Board) refer to Platinum Community Care as a "controlled entity" in internal meetings.

26. Upon starting her employment, Plaintiff Seymour observed numerous troubling issues within the workplace. These included the absence of a coherent organizational structure, the omission of food logs, and insufficient access for employees to necessary software—specifically, no one possessed login credentials for Salesforce software. The existing record-keeping primarily comprised sporadic notes in notebooks bought by staff members.

27. Additionally, the Cheektowaga HERRC, near the Buffalo Niagara International Airport, was merely a dilapidated Quality Inn hotel, plagued by numerous issues such as unclean conditions, foul odors, damaged drywall, exposed electrical outlets, and inadequate amenities.

28. The mattresses displayed deep stains and were infested with insects, leading to the children living there being repeatedly bitten across their bodies. Plaintiffs took numerous photographs of the children to depict the infestation to DocGo leadership.

29. Additionally, the facility was encircled by busy roads, devoid of nearby walking areas, thus rendering it hazardous or unfeasible for guests to leave.

30. Plaintiff Seymour observed vans arriving and departing, often transporting guests, including young women and teenaged girls, to unknown locations for work.

31. State and County officials—in response to a public outcry to the presence of the asylum seekers and an allegation of violence against a migrant—ordered the use of NY National Guard troops to help with the housing of asylum seekers in Buffalo.

32. On August 12, 2023, the Erie County Executive, in the midst of a political campaign, issued a press release stating in part, "The governor has agreed to place National Guard members at each of the hotels to act as a stabilizing presence. As stated to me this morning, it will take a day or two for the National Guard members to arrive, but they will soon be present. I thank Governor Hochul and Commissioner Bray for offering this assistance to further assure that the safety of the entire community comes first."

33. The NY National Guard, some housed nearby in a separate hotel, were occasionally present at the HERRC. Even when they were present, Seymour often watched as they engaged in leisure activities, such as listening to music and playing cards with young guests.

34. When Plaintiff Seymour inquired about the daily whereabouts of the guests, the National Guard on duty frequently responded dismissively, stating that their role was not to "babysit."

35. The food supplied to the guests by Defendant DocGo was frequently inedible (documented by the employee Plaintiffs), resulting in daily waste. Defendant DocGo's staff, including the Plaintiffs, were compelled to discard large quantities of this inedible or unwanted food daily.

36. Furthermore, guests expressed grievances to Plaintiff Seymour about being deceived into traveling to Buffalo and experiencing uncertainty regarding their purpose there. Once more, some were informed that Buffalo was just a few minutes away from New York City,

but it was nearly an 8-hour bus journey away and much closer to Toronto than Manhattan. Many guests also conveyed to Seymour their surprise at how cold it was.

37. Plaintiff Seymour reported these conditions and complaints to her supervisors, including Kareema Washington, who expressed that she shared the same concerns and reported them to more senior management, including the highest-ranking official from DocGo at the Cheektowaga HERRC, Lavar Howard, who ignored their concerns.

### B. DOCGO ALSO IGNORED COMPLAINTS ABOUT SEXUAL RELATIONS BETWEEN THE NATIONAL GUARD AND MIGRANTS AND ASYLUM SEEKERS.

38. Lavar Howard was replaced by Tom Sukmanowski in the Summer of 2023. Sukmanowski promised to cure the problems at the facility, but little changed.

39. Sukmanowski would often hide in his office and scream when approached by Washington or other DocGo staff.

40. He told Plaintiff Washington to stop annoying him and to just "fix it," when she approached him about her concerns.

41. He also belittled her through the daily screaming and insults (such as calling the staff "stupid" and "lazy"), and creating a hostile work environment where Washington was fearful to come to work or speak to him at all.

42. Sukmankowski notably treated Washington and Seymour differently from their White colleagues, assigning them distinct responsibilities even from junior staff. Sukmankowski's behavior was particularly intimidating towards them, with instances of yelling directed at Washington and Seymour being a regular occurrence, unlike with their White, male counterparts.

43. In the absence of effective leadership, the conditions at the Cheektowaga HERCC deteriorated. Plaintiffs Seymour and Washington were particularly alarmed at the inappropriate relationships developing between DocGo employees and guests and the NY National Guardsmen and guests.

44. As with other issues, Plaintiff Seymour reported these relationships to Plaintiff Washington and Washington reported them to Sukmanowski, but there was no immediate response.

45. One of the most notable occasions involving inappropriate behavior is when Mario Bonilla (a DocGo supervisor in his 40s) spent several hours alone in his room with a guest in her 20s.

46. When one of the DocGo employees, a social worker, knocked on the door to ask what was happening, Bonilla told to her to leave them alone.

47. Again, Plaintiff Seymour reported this to Plaintiff Washington and Plaintiff Washington reported it to her supervisors. Given the gravity of this problem, Seymour also reported her complaints to other members of DocGo's leadership, and documented her complaints via email to PCC COO Harris Leitner, PCC COO; Gordon Rich; Jeremy Merrill, DocGo Behavioral Health Lead; Plaintiff Kareema Washington; Levar Howard, DocGo Operations Manager; and Giovanna Bolouki, DocGo National Director of Operations.

48. Plaintiff Seymour's August 30, 2023 email said, in part, "I am writing you all to let you know that I was informed that an asylee is in a sexual relationship with Mario, DocGo site supervisor. Initially, an asylee informed staff then a staff member informed me and stated that they do not want to be identified at this time due to fear of retaliation or the loss of their job. Both staff and the asylee stated that this is an often occurrence."

49. This time, an investigation occurred, but Bonilla returned promptly following the investigation without further discipline.

50. Sukmanowski did, however, transfer a DocGo employee from New York City to manage day-to-day activities. The new manager of day-to-day affairs at the facility was Defendant Rigoberto Nuñez.

51. Under Defendant Nuñez's management, conditions at the Cheektowaga HERRC deteriorated rather than improved.

52. Of particular concern, inappropriate relationships between guests and DocGo staff became more open and unabashed around Halloween of 2023, when the DocGo staff hosted a Halloween party for guests.

53. Several members of the NY National Guard, including Defendant Colon, who was the highest-ranking National Guard at Cheektowaga HERRC, and DocGo employees, including Defendant Nuñez, were observed dancing intimately and romantically kissing guests.

54. The employee Plaintiffs who observed this were astonished, and again expressed concerns to senior staff. But no action was taken, and the inappropriate relationships became more part of accepted daily life at Cheektowaga HERRC.

55. The situation became so extreme that NY National Guardsmen were allowed to transport guests from Cheektowaga HERRC to the nearby hotel where the guardsmen were staying.

56. The guests were (and remain) particularly vulnerable, given their uncertain immigration status, lack of mobility, need of basic supplies, and other needs. Even a trip to Walmart was considered a great gift. Defendants Nuñez, Colon, and others exploited these vulnerabilities.

57. Defendant Colon (in particular) regularly had inappropriate interactions with asylum seeker Plaintiff Jane Doe 1. This was not hidden, as he would bring gifts (including Target gift cards, and Christmas gifts), make sexual comments, and take Jane Doe 1 out of the facility to his home and to other locations for what Colon called "dates."

58. These interactions are documented by dozens of text messages between Plaintiff Jane Doe 1 and Defendant Colon. In those messages Defendant Colon represented to Plaintiff Jane Doe 1 that he has great authority to help her, tells her that he would like to help her get a house, and that he will always support her and her children.

59. On one occasion, he arranged for and transported Plaintiff Jane Doe 1 and her children to a rental property nearly two hours away. Defendant Colon assured her that it would be a fun, family time for Jane Doe 1 and her children. Defendant Colon told Jane Doe 1 to tell anyone who asked that she was going to visit family, and he worked with other NY National Guard members to sneak the family out of the building to his car.

60. Once there, he demanded sexual favors in exchange for his assistance to her and her family. Jane Doe 1, who had journeyed through jungles with her children, evaded sexual traffickers in Mexico, and crossed rivers, suddenly found herself in a snow-covered rural property in America (where she was totally isolated) with her children, facing pressure from a member of the NY National Guard for sex.

61. Unsure of her whereabouts, in dire poverty, and separated from her family and friends in Venezuela, Jane Doe 1 felt she had no choice but to engage in sexual activity with Colon. This event caused severe distress to Jane Doe and her children.

62. Defendant Colon and Defendants John Does 1-5 similarly coerced sexual favors from Plaintiff Jane Does 2-5 for continued access to housing and food and the promise of a favorable outcome for their asylum applications.

63. Defendant Colon explicitly conveyed to Plaintiff Does 2-5 that their safety and well-being in the United States were precarious and subject to his influence. Specifically, he indicated that he could enhance their living arrangements and suggested that he could assist with their citizenship status, provided that Plaintiff Jane Does maintained a close relationship with him and adhered to his expectations as his "family."

64. The next day, upon their return, Defendant Colon immediately began texting Jane Doe 1 his regret saying, among other comments, "I am just so lost and I need to find myself again. I don't recognize the man I have become in these last few months."

65. Defendant Colon also texted, "I am no longer pursing any type of Romantic relationship . . ." "I'm sorry the trip got so screwed up . . . I hope the kids don't hate me."

66. Defendant Colon also begged Jane Doe 1 to keep it a secret.

67. Shortly thereafter, Jane Doe 1 learned that Colon took another guest and her daughter off premises. The guest later complained of this encounter to Plaintiffs, explaining that Defendant Colon massaged her shoulders while staring at her teenage daughter and asking her daughter to sit beside them. The woman in question also explained to staff that Colon began texting her daughter thereafter and telling her that she was attractive.

68. Defendant Colon was not the only member of the NY National Guard to harass Plaintiff Jane Doe 1 and her children. In fact, the guard members and some DocGo staff collaborated to allow Defendant Colon to speak to Jane Doe 1 in private and to allow DocGo staff and National Guard members to leave with other asylum seekers undocumented.

11

69.     Jane Doe 1 even learned that her teenage daughter was taken by one of the National Guard members to a private section of the hotel without a camera, where he groped her legs and told her she was beautiful, until her daughter ran. This same National Guard (only known to them as "Thomas") did this to other young women in the hotel, with many of the families warning their children to avoid him.

70.     Because of these incidents, Plaintiff Jane Doe 1 and her children now live in fear in the hotel, afraid that they will be expelled in the Buffalo cold, like other asylum seekers who fell in disfavor with the National Guard or DocGo staff.

### C.     **VIOLENCE WAS COMMON AT THE HERCC.**

71.     Incidents of violence were unfortunately not uncommon within the facility, and Defendant Nuñez was known for openly harassing and physically assaulting guests.

72.     For example, on November 9, 2023, following an argument between Plaintiffs Alexander and Flor, Defendant Nunez entered the room forcefully with several security guards and Colon.

73.     Defendant Nuñez—far larger than the slight Plaintiff Alexander—began assaulting Plaintiff Alexander without any provocation, even strangling him as Plaintiff Flor begged Defendant Nunez to stop.

74.     Defendant Colon intervened to separate the combatants. Later he confirmed to Plaintiff Seymour that Defendant Nuñez was the aggressor in the altercation.

75.     Plaintiff Seymour, deeply troubled by the ongoing aggression and violence exhibited by Defendant Nuñez, immediately voiced her concerns to both Defendant Nuñez and Defendant Colon.

76. Defendant Nuñez unilaterally demanded that Plaintiff Alexander leave Cheektowaga HERRC.

77. Plaintiff Alexander was then expelled into the frigid Buffalo winter alone.

78. Subsequently, Plaintiff Alexander found himself homeless in Buffalo, first spending several days seeking shelter behind a dumpster near a gas station.

79. He now survives by seeking day labor, trading work for a place to stay, and resorting to sleeping on floors, in utility closets, and in basements offered by those willing to give him random work.

80. Plaintiff Flor, acting as a single parent, is caring for their two children within Cheektowaga HERRC. She endures frequent taunting from Defendant Nuñez and lives in constant fear.

81. In addition to her concerns regarding Defendant Nuñez's attack on Plaintiff Alexander, Plaintiff Seymour also again reported the existence of inappropriate relationships between National Guardsmen and guests, which included sexual communications with minors.

82. Plaintiff Seymour was terminated shortly thereafter, in December 2023, with the justification given that she had become too emotionally involved with the guests, despite her efforts to address the grave issues plaguing the facility.

83. Plaintiff Washington resigned in December, frustrated that her many complaints were ignored and exhausted by living in constant fear and turmoil at Cheektowaga HERRC.

## CLAIMS

### AS AND FOR A FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against Defendants DocGo, Rigoberto Nuñez, and John Does 6-15)

84. Defendants' actions constitute negligence under New York law. Specifically, Defendants breached their duty of care owed to Plaintiffs Flor, Alexander and Jane Does 1-5, resulting in injuries and damages.

### AS AND FOR A SECOND CAUSE OF ACTION
### BATTERY
### (Against Defendant Rigoberto Nuñez)

85. Defendant Nuñez intentionally and harmfully touched Plaintiff Alexander without consent.

### AS AND FOR A THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendants DocGo, NY National Guard, Deven Colon, Rigoberto Nuñez, and John Does 6-15)

86. Defendants' conduct was outrageous, extreme, and caused severe emotional distress to Plaintiffs.

### AS AND FOR A FOURTH CAUSE OF ACTION
### FALSE IMPRISONMENT
### (Against Defendant Rigoberto Nuñez)

87. Defendant Nuñez unlawfully deprived Plaintiff Alexander of his freedom leading up to and during the physical assault.

## AS AND FOR A FIFTH CAUSE OF ACTION
### 42 USC § 1983
**(Against Defendants NY National Guard, Deven Colon and John Does 1-10)**

88. By Defendants' acts and practices of coercing Plaintiffs Jane Does 1-5 into trading sexual favors for food and housing, Defendants have deprived Plaintiffs of rights secured by the United States Constitution and laws and the Civil Rights Act of 1871.

89. At all relevant times, Defendants acted under color of law.

90. At all relevant times, Defendants Deven Colon and John Does 1-10 acted under a policy and/or practice maintained with the knowledge of Defendant NY National Guard.

91. Defendants' conduct was outrageous and done with malice and/or reckless disregard to Plaintiff's rights such that it shocks the conscience.

92. As a result of Defendants' actions, Plaintiff has suffered damages including economic damages, compensatory damages, costs, and attorneys' fees and interest.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### HOSTILE WORK ENVIRONMENT (NYSHRL)
**(Against Defendants DocGo, Rigoberto Nuñez, and John Does 11-15)**

93. By Defendants' acts and practices in fostering a hostile work environment on the basis of race, gender and/or national origin, Defendants have discriminated against Plaintiffs Washington, Seymour with respect to their terms and conditions of employment in deprivation of their rights secured by the NYSHRL.

94. Defendants' conduct was outrageous and done with malice and/or reckless disregard to Plaintiffs' rights such that it shocks the conscience.

95. As a result of Defendants' actions, Plaintiffs have suffered damages including economic damages, compensatory damages, costs, and attorneys' fees and interest.

## **AS AND FOR AN EIGHTH CAUSE OF ACTION**
### **WORKPLACE RETALIATION (NYSHRL)**
**(Against Defendants DocGo, Rigoberto Nuñez, and John Does 11-15)**

96. Defendant retaliated against Plaintiff Seymour for complaining about hostile work environment, violating anti-retaliation provisions of the NYSHRL.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment:

a. Enjoining Defendants from maintaining a racially hostile workplace environment and from violating Plaintiffs' constitutional rights.

b. Awarding Plaintiffs all lost pay and benefits.

c. Awarding Plaintiffs any and all additional statutory damages available under the law.

d. Awarding Plaintiffs emotional distress damages in an amount to be determined at trial but in no event less than $9,000,000;

e. Awarding compensatory damages and damages for loss of reputation to Plaintiffs in an amount to be determined at trial but in no event less than $9,000,000;

f. Awarding Plaintiffs attorneys' fees and costs, and granting such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs demand a jury trial.

Dated: New York, New York
May 7, 2024

>ADVOCATES FOR JUSTICE,
>CHARTERED ATTORNEYS
>
>By: /s/ *Laine A. Armstrong*
>Laine A. Armstrong
>Nathan D. McMurray
>225 Broadway, Suite 1902
>New York, New York 10007
>(212) 285-1400
>laine@advocatesny.com
>nmcmurray@advocatesny.com